# IN THE SUPREME COURT OF IOWA

No. 135 / 05-1063

Filed February 23, 2007

**BITUMINOUS CASUALTY CORPORATION**,
An Illinois Insurance Company,

Movant,

vs.

**SAND LIVESTOCK SYSTEMS, INC.**, a
Nebraska Corporation; **SAND SYSTEMS, INC.**,
a Nebraska Corporation; **FURNAS COUNTY
FARMS**, a Nebraska General Partnership; and
**CORI A. GOSSAGE**, Individually and as
Administrator of the Estate of Raymond Charles
Gossage, Jr., and as Next Friend and Mother of
Brian M. Gossage,

Respondents.

_____

Certified questions of law from the United States District Court for the Northern District of Iowa, Paul A. Zoss, Judge.

In a certified question, the federal district court asked the supreme court to determine whether a pollution exclusion provision in an insurance policy bars coverage for a death caused by the accumulation of carbon monoxide inside a washroom. **CERTIFIED QUESTION ANSWERED.**

Timothy W. Hamann and Jared Knapp of Clark, Butler, Walsh & Hamann, Waterloo, for movant.

Donald H. Molstad, Sioux City, and Patrick W. O'Bryan, Des Moines, for respondent Sand Livestock Systems, Inc.

Robert A. Burnett, Jr., Des Moines, for respondent Gossage.


Laura A. Foggan of Wiley, Rein & Fielding, Washington, D.C., and David N. May of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for amicus curiae Complex Insurance Claims Litigation Association.

**STREIT, Justice.**

Is carbon monoxide pollution? Sand Livestock was sued for wrongful death after a man died of carbon monoxide poisoning in a hog confinement facility the company designed and built. Sand Livestock's insurer, Bituminous Casualty, sought a declaration that Sand Livestock's insurance did not cover the incident because of a pollution exclusion provision. In response to a certified question, we find the provision unambiguously excludes coverage. We do not decide whether a reasonable policy holder would expect the exclusion to only pertain to "traditional environmental pollution."

### I. Facts and Prior Proceedings

Sand Livestock constructed a hog confinement facility in Ida County, Iowa for Furnas County Farms. During the construction, Sand Livestock installed a propane power washer in the facility's washroom. In 2002, Raymond Gossage, an employee of Furnas County Farms, was working at the facility. While using the toilet in the washroom, Gossage was overcome by carbon monoxide fumes. The propane gas heater for the pressure washer produced the fumes. Furnas was later cited by the Iowa Occupational Safety and Health Administration for having a propane device in a room without an outside air supply. According to the autopsy, Gossage died as a result of asphyxiation due to carbon monoxide poisoning.

In 2003, Gossage's widow filed a wrongful death suit against Sand Livestock in the Ida County, Iowa district court. Sand Livestock requested its insurer, Bituminous Casualty, provide a legal defense and indemnification pursuant to two insurance policies. Bituminous had

issued Sand Livestock a "Commercial Lines Policy" and a "Commercial Umbrella Policy" for the time of Gossage's death.

The Commercial Lines Policy contained an endorsement entitled "Total Pollution Exclusion with a Hostile Fire Exception," which stated:

> This insurance does not apply to:
>
> **f.    Pollution**
> **(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

"Pollutants" are defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

The Commercial Umbrella Policy contained an endorsement entitled "Pollution Exclusion" which stated:

> It is agreed that this policy does not apply:
>
> A.    to any liability for "bodily injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants at any time."
>
> . . . .
>
> C.    to any obligation of the "insured" to indemnify or contribute to any party because of "bodily injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."
>
> D.    to any obligation to defend any "suit" or "claim" against any "insured" alleging "bodily injury," "property damage" or "personal and advertising injury" and seeking damages for "bodily injury," "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants."
>
> . . . .

"Pollutants" means any solid, liquid, gaseous, or thermal irritants or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. . . .

In 2004, Bituminous filed a complaint in federal court seeking a declaration it has no duty to pay damages to Mrs. Gossage or to defend or indemnify Sand Livestock for the death of Gossage because of the pollution exclusions contained in both policies. A year later, Bituminous filed a motion for summary judgment. Bituminous claimed the pollution exclusions in the policies preclude coverage. Sand Livestock and Mrs. Gossage argued the exclusions do not apply to the particular facts of this case and Bituminous is obligated to defend Sand Livestock and cover any losses that may arise if Sand Livestock is found to be liable.

In its ruling, the federal court noted that because we have not interpreted a pollution exclusion in an insurance policy in this particular context, it must "predict" how we would do so. The federal court stated "courts throughout the United States have interpreted pollution exclusions such as those contained in the policies at issue, and have reached a dizzying array of results." *See* Claudia G. Catalano, Annotation, *What Constitutes "Pollutant," "Contaminant," "Irritant," or "Waste" within Meaning of Absolute or Total Pollution Exclusion in Liability Insurance Policy*, 98 A.L.R.5th 193 (2002). After reviewing other courts' approaches to this issue, the federal court concluded "both parties' positions are supported by case law from other jurisdictions, and there is no Iowa case either directly on point or sufficiently definitive to allow this court to predict how the Iowa Supreme Court would decide the issue presented here." Consequently, the federal court certified to us the following question:

Do the total pollution exclusions in the policies issued by Bituminous to Sand Livestock relieve Bituminous from any obligation to defend or indemnify Sand Livestock, or to pay damages to Mrs. Gossage, for claims arising out of the death of Raymond Gossage?

## II.    Merits

The issue before us is whether the pollution exclusions found in Sand Livestock's insurance policies exclude coverage for a death caused by the release of carbon monoxide fumes inside a hog confinement facility.

Mrs. Gossage and Sand Livestock urge us to find the policies in question provide coverage for Gossage's death. Mrs. Gossage argues the pollution exclusions are ambiguous because it is unclear whether their scope extends beyond "traditional environmental pollution." Mrs. Gossage reminds us an ambiguous provision is construed in favor of the insured. Under slightly different reasoning, Sand Livestock argues the doctrine of reasonable expectations applies. Sand Livestock argues a reasonable policyholder would expect the pollution exclusions to prevent coverage for "traditional hog confinement problems associated with pollution wastes and smells, and not wrongful death claims based on an alleged negligent design of a hog confinement facility which allowed carbon monoxide to accumulate." Bituminous argues the pollution exclusions clearly and succinctly prevent coverage for carbon monoxide poisoning and Bituminous urges us to hold it has no duty to defend or indemnify Sand Livestock.

### A.    Whether the Pollution Exclusions are Ambiguous

We begin with our rules of contract interpretation peculiar to insurance policies.

The cardinal principle in the construction and interpretation of insurance policies is that the intent of the parties at the

time the policy was sold must control. Except in cases of ambiguity, the intent of the parties is determined by the language of the policy. "An ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one." Because of the adhesive nature of insurance policies, their provisions are construed in the light most favorable to the insured. Exclusions from coverage are construed strictly against the insurer.

*LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 307 (Iowa 1998) (citations omitted).

"[W]hen an insurer has affirmatively expressed coverage through broad promises, it assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Grinnell Mut. Reins. Co. v. Jungling*, 654 N.W.2d 530, 536 (Iowa 2002) (citing *Amco Ins. Co. v. Haht*, 490 N.W.2d 843, 845 (Iowa 1992)). Words that are not defined in the policy are given "their ordinary meaning, one that a reasonable person would understand them to mean." *Id.* (citing *A.Y. McDonald Indus. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991)). This is because we interpret insurance policies from the standpoint of an ordinary person, not a specialist or expert. *Id.* (citing *Haht*, 490 N.W.2d at 845).

Where the meaning of terms in an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted. However, the mere fact that parties disagree on the meaning of terms does not establish ambiguity. The test is an objective one: Is the language fairly susceptible to two interpretations?

*N. Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987) (citations omitted).

Bituminous argues the pollution exclusions unambiguously apply to the facts of this case. It claims carbon monoxide is a "pollutant" as defined by the policy and Gossage's death was clearly due to "dispersal,"

"release," or "escape" of this "pollutant." The exclusions define "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." According to Bituminous, "[t]here is nothing in this broad definition which would exclude carbon monoxide." Bituminous characterizes carbon monoxide as a gaseous irritant or contaminant. Carbon monoxide is defined in the dictionary as "a colorless odorless very toxic gas." *Webster's Third New International Dictionary* 336 (unabr. ed. rev. 2002).

We agree with Bituminous that carbon monoxide falls within the extremely broad language of the policies' definition of "pollutants." It is difficult to say the exclusions are "fairly susceptible to two interpretations," which is required for us to find the exclusions ambiguous.

Mrs. Gossage argues the exclusion is ambiguous because it is unclear whether the exclusion extends beyond "traditional environmental pollution." She claims her position is supported by the original purpose of pollution exclusions. One commentator explained "the available evidence most strongly suggests that the absolute pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual environmental degradation and government-mandated cleanup such as Superfund response cost reimbursement." Jeffrey W. Stempel, *Reason and Pollution: Correctly Construing the "Absolute" Exclusion in Context and in Accord with Its Purpose and Party Expectations*, 34 Torts & Ins. L.J. 1, 32 (Fall 1998); *see Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) ("Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an

exclusion for pollution-related injuries was the avoidance of the 'enormous expense and exposure resulting from the "explosion" of *environmental* litigation.' "); *Bernhardt v. Hartford Fire Ins. Co.*, 648 A.2d 1047, 1049–50 (Md. Ct. App. 1995) (detailing the evolution of pollution exclusions). But the plain language of the exclusions at issue here makes no distinction between "traditional environmental pollution" and injuries arising from normal business operations. *See Cincinnati Ins. Co. v. Becker Warehouse, Inc.*, 635 N.W.2d 112, 120 (Neb. 2001).

The Supreme Court of Illinois, which analyzed a nearly identical exclusion, acknowledged:

> A close examination of this language reveals that the exclusion (i) identifies the types of injury-producing materials which constitute a pollutant, *i.e.,* smoke, vapor, soot, *etc.,* (ii) sets forth the physical or elemental states in which the materials may be said to exist, *i.e.,* solid, liquid, gaseous or thermal, and (iii) specifies the various means by which the materials can be disseminated, *i.e.,* discharge, dispersal, release or escape. To that extent, therefore, the exclusion is indeed "quite specific," and those courts wishing to focus exclusively on the bare language of the exclusion will have no difficulty in concluding that it is also unambiguous.

*Koloms*, 687 N.E.2d at 79. Although the court in *Koloms* looked beyond the "bare language of the exclusion" to find ambiguity, we find it inappropriate and unwise to do so. An ambiguity exists only if the language of the exclusion is "susceptible to two interpretations." *Holty*, 402 N.W.2d at 454. We may not refer to extrinsic evidence in order to create ambiguity. *Becker Warehouse*, 635 N.W.2d at 120; *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 742 (Wash. 2005). Instead, we must enforce unambiguous exclusions as written. *Leuchtenmacher v. Farm Bureau Mut. Ins. Co.*, 461 N.W.2d 291, 294 (Iowa 1990). The plain language in the exclusions encompasses the injury at issue here because

carbon monoxide is a gaseous irritant or contaminant, which was released from the propane power washer. *See Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1006 (4th Cir. 1998) (finding pollution exclusion unambiguously barred coverage for carbon monoxide poisoning); *Essex Ins. Co. v. Tri-Town Corp.*, 863 F. Supp. 38, 41 (D. Mass. 1994) (same); *Bernhardt*, 648 A.2d at 1052 (same).

### B. Whether a Reasonable Policyholder Would Expect Coverage Under These Facts

Sand Livestock argues Bituminous should be required to provide coverage based on the doctrine of reasonable expectations, which Iowa recognizes. Sand Livestock claims an ordinary lay person would not comprehend the breadth of the pollution exclusions. An insured may utilize the doctrine of reasonable expectations to avoid an exclusion that " '(1) is bizarre or oppressive, (2) eviscerates a term to which the parties have explicitly agreed, or (3) eliminates the dominant purpose of the policy.' " *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Federated Mut. Ins. Co.*, 596 N.W.2d 546, 551 (Iowa 1999) (quoting *Benavides v. J.C. Penney Life Ins. Co.*, 539 N.W.2d 352, 356 (Iowa 1995)). However, in order for the doctrine to apply, the insured must show " 'circumstances attributable to the insurer that fostered coverage expectations' or that 'the policy is such that an ordinary layperson would misunderstand its coverage.' " *Id.* (quoting *Benavides*, 539 N.W.2d at 357).

Because this case comes to us as a certified question from the federal district court, this issue is not properly before us. Iowa Code section 684A.1 (2003) gives this court the power to answer certified "questions of law." The applicability of the doctrine of reasonable expectations is a question of fact that is not within the scope of chapter

684A. *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 170 n.1 (Iowa 2002). Sand Livestock and Mrs. Gossage are free to argue the doctrine of reasonable expectations to the federal district court.

### III. Conclusion

We find the pollution exclusions in Sand Livestock's insurance policies bar coverage for Gossage's death, which was caused by carbon monoxide poisoning. Accordingly, our answer to the certified question is "yes."

**CERTIFIED QUESTION ANSWERED.**